AO 91 (Rev. 11/11) Criminal Complaint      AUSA Sean Franzblau (312) 353-5305

**FILED**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FEB 22 2019

MAGISTRATE JUDGE
SHEILA M. FINNEGAN

UNITED STATES OF AMERICA

v.

MINGHAN CHEN

CASE NUMBER:

**UNDER SEAL** 19 C R      158

MAGISTRATE JUDGE FINNEGAN

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about February 2017 to on or about October 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1956(h) | Conspiracy to commit money laundering |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

_____
STEFANIE MOTON
Special     Agent,     Homeland     Security
Investigations (HSI)

Sworn to before me and signed in my presence.

Date: February 22, 2019

_____
Judge's signature

City and state: Chicago, Illinois

SHEILA FINNEGAN, U.S. Magistrate Judge
Printed name and Title

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ss

## **AFFIDAVIT**

I, STEFANIE MOTON, being duly sworn, state as follows:

## A.   PRELIMINARY MATTERS

1.     I am a Special Agent with the Homeland Security Investigations (HSI) and have been so employed since approximately June 2010.  As part of my duties, I investigate criminal violations relating to narcotics trafficking and money laundering offenses, including criminal violations of the Federal Controlled Substance and Money Laundering laws.  I have received training in and have experience investigating violations of federal narcotics and money laundering laws including, but not limited to, Title 21, United States Code, Sections 841, 843, 846, 952, 959, and 963, and Title 18, United States Code, Section 1956.

2.     This affidavit is submitted in support of a criminal complaint alleging that MINGHAN CHEN has violated Title 18, United States Code, Section 1956(h). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging CHEN with conspiracy to commit money laundering, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.     The information set forth in this Affidavit is based upon my participation in this investigation, interviews of witnesses, information received from other law enforcement agents, review of court-authorized intercepts, consensual recordings, and other relevant documents, and my experience and training. Because of the limited purpose of this Affidavit, I have not included all of the facts known to me or other law enforcement officers about the investigation.

4.     This Affidavit contains summaries of court-authorized intercepts and consensually recorded conversations. These summaries may not include references to all the topics covered during the course of the conversations. In addition, the summaries may not include references to all statements made by the speakers on the topics that are mentioned. Some of the summaries contained herein are based on English translations of Chinese conversations. The translations of WeChat messages are preliminary, not final. Unless otherwise noted, all WeChat messages are listed in Central Standard Time (CST). In some instances, where a party to the conversation is speaking in code, my understanding of the meaning of certain words or phrases in a recorded communication is included in the summary in brackets. My understanding is based on my training and experience, my involvement in this particular investigation (including witness interviews, my review of intercepted communications, physical surveillance, money seizures, and my review of bank records), and my conversations with other agents involved in this investigation.

5.     This investigation is ongoing; several targets have not yet been charged, and some remain unidentified. To prevent alerting certain targets that they are

under investigation, which may cause them to flee, destroy evidence, or otherwise compromise the ongoing investigation, throughout this Affidavit I use general monikers to refer to uncharged and/or unidentified targets, as well as substitute (and simplified) Blackberry PIN numbers.

**B.    BACKGROUND ON MONEY LAUNDERING**

6.    I am aware there are numerous money laundering and drug trafficking organizations ("MLDTO") operating in the country of Mexico.  Examples of some of these MLDTOs are the Sinaloa Cartel, Beltran-Leyva Cartel, La Familia Michoacána, the Gulf Cartel, and the Cartel de Jalisco Nueva Generation (CJNG). As a general rule, these Mexico-based MLDTO's purchase South American processed cocaine, which is transshipped through Mexico and smuggled into the United States. These MLDTO's also grow, cultivate, cook and process heroin, methamphetamine, and marijuana in Mexico and subsequently smuggle the controlled substances into the United States for resale.  The sale of these controlled substances in the United States generates substantial cash proceeds for the MLDTOs, which cash represents the cost of goods sold and illegal profits.

7.    I am also aware that after sale of the controlled substances, the proceeds from the sales must be collected, counted, packaged and delivered in some fashion to the MLDTOs.  These funds may represent the cost of goods sold and illegal profits. At times, both the cost of goods sold and profits are laundered directly into Mexico. This can occur through a technique known as bulk cash smuggling.  Bulk cash smuggling consists of concealing and exporting large sums of United States currency

("USC") without declaring the funds at the United States border. Transportation of bulk USC may be accomplished via semi-trailers, automobiles, airplanes, trains, and commercial bus lines. One disadvantage of bulk cash smuggling is the risk of transporting large sums of cash through the United States and onward to Mexico. The loads of USC are susceptible to theft or interdiction by law enforcement. An additional disadvantage to bulk cash smuggling is the resulting accumulation of large quantities of USC in Mexico by the MLDTOs, which is becoming increasingly difficult for MLDTOs to integrate into the Mexican financial system.

8.     To circumvent the risks of bulk cash smuggling, MLDTOs frequently utilize U.S.-based banks and businesses to launder narcotics proceeds. The USC is either directly wire transferred to Mexican-based bank accounts after being deposited into U.S. bank accounts, or the funds are integrated into the United States financial system through a more elaborate money laundering scheme known as "trade based money laundering." These services are provided to the MLDTOs by brokers, typically based in Mexico, who have the contacts needed to accept large sums of USC and cause those funds to be deposited into a U.S.-based bank account.

9.     One of the most common practices for an MLDTO-associated broker to collect USC in the United States is through a "money pickup." In a typical money pickup, the MLDTO-associated broker arranges for a U.S.-based co-conspirator (the "money laundering (ML) courier") to meet an individual in possession of a large quantity of cash narcotics proceeds (the "drug trafficking (DT) courier"). As discussed further below, to arrange the meeting, the ML courier typically provides the MLDTO-

associated broker a telephone number, a code phrase or name, and the serial number of a dollar bill in the ML courier's possession. This serial number is used as an identifier for the specific money laundering transaction at issue (MLDTO-associated brokers often simultaneously handle multiple money laundering contracts), and later functions as a receipt issued by the ML courier to the DT courier to prove the money pickup has been completed. The MLDTO-associated broker then passes this information to the MLDTO drug trafficker client, who in turn passes it to the affiliated U.S.-based DT courier. The DT courier then uses the phone number to contact the ML courier and arrange a physical meeting in the United States at which the DT courier transfers the narcotics proceeds to the ML courier. During this initial contact, the DT courier will address the ML courier by his/her code name, and/or use the code phrase to confirm the DT courier's identity and give the serial number to identify the specific transaction.

10.     After the DT and ML couriers make contact, typically they agree upon a public place at which to meet and conduct the exchange of the cash narcotics proceeds. Utilizing a public place, such as a hotel lobby, allows the parties to maintain a degree of anonymity, which reduces the risk of theft and risk of cooperation with law enforcement if one party is subsequently arrested. After a location is agreed upon, the DT courier meets with the ML courier and delivers the bulk USC. Typically, the ML courier then passes the dollar bill with the previously provided serial number to the DT courier as a "receipt" for the money transfer. The USC is frequently transported in large bags and suitcases to conceal the contents.

11.     Upon completion of the money pickup, the MLDTO-associated broker typically assumes responsibility for the cash to the MLDTO if it is lost, stolen, or seized prior to delivery to the MLDTO.  As such, the MLDTO-associated money broker will generally seek to have the cash deposited into a U.S. bank account as soon as possible.  Generally, bulk cash narcotics proceeds are deposited into the banking system in one of two ways, both of which are designed to conceal the illicit source of the funds.   The first is through structured deposits, meaning a bulk cash sum is broken down into several deposits of under $10,000 to avoid bank reporting requirements.  The second is through "trade-based money laundering," in which narcotics proceeds are used to purchase legitimate goods or services and enter the banking system concealed as the proceeds of lawful business.  On occasion, the MLDTO-associated money broker will require the ML courier to provide copies of deposit tickets or wire instructions as proof of the deposit or wire transfer of the funds.  At times, this information is provided to the MLDTO to confirm that the illegal proceeds were received and deposited, or wire transferred.  Ultimately, after entering the banking system, the funds are remitted to accounts in Mexico controlled by MLDTO-associated brokers, who withdraw the funds and deliver them to their drug trafficker clients in Mexico.  The MLDTO typically pays the MLDTO-associated brokers and his/her couriers through a percentage fee of the total amount laundered per transaction.

C.    FACTS ESTABLISHING PROBABLE CAUSE

12.    Since in or around January 2017, the government has investigated a network of Chinese money brokers based in Mexico who regularly contract with DTOs to pick up and launder bulk quantities of narcotics proceeds in the United States, and launder the funds through trade based money laundering involving Chinese bank accounts and businesses. The investigation has involved court-authorized interceptions, debriefs of multiple confidential informants, physical surveillance in the United States and Mexico, multiple court-authorized searches, and the seizure of approximately $4.5 million in suspected narcotics proceeds.

13.    Agents have identified MINGHAN CHEN as a Mexico-based broker who facilitates the pickup and laundering of narcotics proceeds in Chicago and elsewhere. As set out below, in February 2017 and October 2018, agents seized bulk quantities of suspected cash narcotics proceeds from two of CHEN's Chicago-based couriers, Individuals 1 and 4, respectively. In later interviews, Individuals 1 and 4 admitted they picked up the cash at CHEN's direction, and that, prior to the seizures, they had conducted multiple other cash pickups for CHEN. Individuals 1 and 4 both admitted to knowing that the cash that they picked up for CHEN was derived from drug sales. As set out below, Individual 1 and 4's information—including their connection to CHEN—was corroborated in significant respects by independent evidence, including evidence obtained from searches of Individual 1 and 4's respective apartments and phones, as well as travel and toll records.

A.  Individual 1 Information

14.    On or about February 23, 2017, at approximately 10:50 a.m., investigating agents were conducting surveillance of Individual 1, a suspected money laundering courier, in the area of Wentworth Avenue and 26th Avenue in Chicago. Agents observed Individual 1 standing on the sidewalk in front of a residence.  Agents observed a silver Honda Civic approach the area where Individual 1 and the other Asian males were standing. Agents observed three Hispanic males inside the Honda Civic, one of whom appeared to be on his cellphone.  Agents then observed Individual 1 appear to receive a phone call on his/her cellphone, and then look around as if s/he was looking for someone.  At that point, agents observed Individual 1 approach the Honda civic and meet with the individuals inside the vehicle. Individual 1 did not appear to be carrying anything as s/he approached the Civic.

15.    Minutes later, at approximately 10:53 a.m., investigating agents observed Individual 1 walk away from the Honda Civic carrying a medium sized box that was green and yellow in color.  After Individual 1 walked away from the Civic, the Civic pulled away from the curb and departed the area.  Individual 1 then entered a residence located on Wentworth Ave.

16.    Later on February 23, 2017, at approximately 11:45 a.m., investigating agents observed Individual 1 exit the residence carrying a gray paper shopping bag. Individual 1 walked towards the rear of the residence and then turned around and walked to the front where he met an Asian female, later identified as Individual 2, who was seated inside a gold Toyota Sienna minivan parked in front of the residence.

Individual 1 placed the gray shopping bag into the minivan and then walked back inside the residence. Individual 2 then departed the area in the gold minivan and agents followed her. Individual 2 traveled to a grocery store on Wentworth Avenue that operated a registered money transferring service, Business A. Agents observed an Asian male, Individual 3, exit Business A and approach the gold minivan. Agents observed Individual 2 hand the gray shopping bag to Individual 3, who carried the bag back into Business A. Agents followed Individual 3 into Business A and recovered the grey shopping bag in a meat locker freezer located inside Business A. Inside the bag, agents found approximately $130,812 in suspected narcotics proceeds.

17. Later on February 23, 2017, at approximately 12:00 p.m., agents made contact with Individual 1 at the residence on Wentworth Avenue. Individual 1 told agents that s/he lived at the residence, and gave voluntary consent for agents to search the residence. Inside the residence, agents found two ledgers, two money counter machines, 3 cellular telephones, and plastic wrapping material and rubber bands that, based on my training and experience, are frequently used to package bulk quantities of narcotics proceeds. Following the search, agents asked to interview Individual 1, but s/he refused. Agents seized the ledgers, money counting machines, cellular telephones, and suspected money-packaging materials.

18. On or about March 10, 2017, agents obtained a warrant to search the three cellular telephones seized from Individual 1's residence. On the phones, agents recovered multiple "WeChat" communications in which Individual 1 appeared to direct a third-party, who used screenname "Money Gram" to wire money to bank

accounts in China. In several of the WeChat communications, including ones that appeared to have been sent in or around February 2017, the name MINGHAN CHEN appeared next to the bank account number. An example of one such communication recovered from Individual 1's phone is below:

| | [START TIME 2:05 PM] |
|---|---|
| Individual 1: | *Agricultural Bank of China*<br>*6228480616704257578*<br>*Wencun Branch, Taishan City, Guangdong Province*<br>**Minghan Chen[1]**<br><br>*Industrial and Commercial Bank of China*<br>*6212262012009063887*<br>*Taicheng Branch, Guangdong Province*<br>**Minghan Chen**<br><br>*Industrial and Commercial Bank of China*<br>*6212262012006752029*<br>*Taicheng Branch, Taishan City, Guangdong Province*<br>*Zhuoyu Chen*<br><br>*Agricultural Bank of China*<br>*6228480616221691879*<br>*Wencun Branch, Taishan City, Guangdong Province*<br>*Zhuoyu Chen* |
| MoneyGram: | Ok. |
| | [START TIME 7:36 PM] |
| Individual 1: | The second order is for 150,000. Exchange rate 6.86. |
| Individual 1: | 13/Zhongyou Huang<br>6212-2620-1200-135-1207<br>Nandao Branch, Kaiping<br>Industrial and Commercial Bank of China<br><br>14/Jianliang Feng |

---

[1]    Emphasis added here to assist the reader—CHEN's name did not appear in bold in the original messages.

| | |
|---|---|
| | 6222022012015184602<br>Jiangmen Branch<br>Industrial and Commercial Bank of China<br>15/Bolong Feng<br>6228480616216796170<br>Enping Branch<br>Agricultural Bank of China |
| MoneyGram: | Ok. |
| MoneyGram: | 2/14/2017<br>150,000 x 6.86 = 1,029,000<br>150,000 x 6.86 = 1,029,000 |

19.     Based on my training and experience, as well as my involvement in this investigation, I interpret the message string above as follows: Individual 1 was directing "MoneyGram" to wire a total of $300,000 (split into two "orders" of $150,000), to six different bank accounts in China, including two bank accounts in the name of MINGHAN CHEN.   Prior to conducting the wiring, "MoneyGram" converted the dollar amount into Chinese RMB ("the exchange rate is 6.86") so Individual 1 and his bosses, including CHEN, would know the amount of RMB they should expect to receive in their accounts in China.

20.     In or around March 2018, Individual 1 began cooperating in this investigation.[2] In summary and pertinent part, Individual 1 told agents that, for the past approximately 2 years, at the direction of various Chinese money-brokers based

---

[2]     Individual 1 has no prior criminal convictions. Agents have explained to Individual 1 that s/he will be charged in connection with his/her involvement in money laundering, and s/he is cooperating in the hopes of receiving a reduced sentence if convicted. I believe ML 1 is a reliable source, as his/her information is corroborated in significant respects by independent evidence, including toll records, WeChat messages, physical surveillance, witness interviews, and money seizures.

in Mexico, s/he had regularly received bulk quantities of drug proceeds in Chicago and transferred the proceeds to Chinese business owners in Chicago and New York who were able to launder the funds through China. Individual 1 identified Individual 2 as one of the Chinese business owners s/he used to launder money. Specifically, Individual 1 stated that Individual 2 was able to conduct wire transfers from Individual 2's business, Business A, to bank accounts in China controlled by the money brokers for whom Individual 1 worked. Agents showed Individual 1 the WeChat communications recovered from his/her cellular telephones (mentioned in the paragraph above) in which Individual 1 appeared to direct a third-party with screenname "Money Gram" to wire proceeds to bank accounts in China. Individual 1 stated that "Money Gram" was Individual 2's WeChat screenname. Individual 1 confirmed that, in the message, Individual 1 was directing Individual 2 to wire money that Individual 1 had previously picked up from suspected narcotics traffickers in Chicago to bank accounts in China, for purposes of laundering the funds.

21.  Individual 1 identified MINGHAN CHEN as one of the Mexico-based money brokers for whom s/he laundered money.[3] According to Individual 1, s/he met CHEN in Chicago sometime in or around 2015, when CHEN was living in Chicago. According to Individual 1, CHEN is from Guangzhou, China, and now lives in Mexico. According to Individual 1, after moving to Mexico in or around 2016, CHEN

---

[3]   Individual 1 first identified CHEN by his full name. Agents later showed Individual 1 a photobook containing approximately 100 unmarked photographs of (mostly Asian male) suspects in this case, and Individual 1 correctly identified CHEN's photograph (which agents had obtained from CHEN's 2015 application for a United States visa, submitted at the United States Embassy in Mexico City.

frequently travelled from Mexico to the United States, and Individual 1 occasionally met with CHEN when he traveled to Chicago on these trips.[4]

22.     According to Individual 1, between approximately November 2016 and February 2017, Individual 1 participated in over ten money pickups in Chicago at CHEN's direction.  According to Individual 1, at or around the time that Individual 1 began working for CHEN, CHEN explained to Individual 1 that CHEN received money laundering contracts from various Mexico-based DTOs, and that the money that Individual 1 picked up for CHEN was the proceeds of narcotics sales.

23.     According to Individual 1, the $122,000 that agents seized from Individual 3 at Business A on or about February 23, 2017, was from a money pickup that Individual 1 had conducted for CHEN.  According to Individual 1, shortly before the February 23 money pickup, CHEN contacted Individual 1 via WeChat and asked if s/he was available for a pickup.  Individual 1 told CHEN s/he was available and then, at CHEN's direction, sent CHEN over WeChat a serial number from a dollar bill in Individual 1's possession, and a phone number for Individual 1.  According to Individual 1, shortly after providing CHEN with this information, Individual 1 received a phone call from a Hispanic male (UM) on the number that s/he had provided to CHEN.  Individual 1 and the UM arranged to meet in front of Individual 1's residence on Wentworth Street in Chicago so that the UM could deliver money to

---

[4]     Based on DHS records, including Customs and Border Protection border-crossing records and CHEN's 2015 application for a United States visa, I know that CHEN was born in Guangzhou, China, and now resides in Mexico City, Mexico. Border crossing records show that, between January 2016 and April 2018, CHEN traveled between Mexico and the United States approximately 61 times.

Individual 1. According to Individual 1, on February 23, 2018, the UM delivered approximately $120,000 to Individual 1 in front of his/her residence. According to Individual 1 (and consistent with agents' surveillance, see paragraphs 14-16), the UM arrived at the meeting driving a small sedan with two other Hispanic males inside the car. According to Individual 1, the UM gave Individual 1 a small box that had the money inside it. According to Individual 1, after receiving the money, s/he went inside his/her residence to count it. After counting the money, Individual 1 contacted Individual 2 to come pick it up from Individual 1, which Individual 2 did later the same day.

24. According to Individual 1, when s/he later learned the money s/he delivered to Individual 2 had been seized, s/he notified CHEN via WeChat. According to Individual 1, CHEN asked Individual 1 for a receipt from law enforcement showing that the money was seized.[5] According to Individual 1, s/he asked Individual 2 for a receipt of the seizure of the approximately $120,000 at Business A, but Individual 2 did not provide it to him/her. According to Individual 1, because s/he was unable to provide CHEN with a receipt for the seizure, CHEN accused Individual 1 of stealing the money and CHEN stopped working and communicating with Individual 1.

---

[5] Based on my training and experience, when law enforcement seizes drugs and money from drug traffickers and money launderers, the drug trafficker who owns the product requests the receipt that law enforcement issues in the event of a seizure. The receipt will display the name of the individual from whom the funds were seized. From this the drug trafficker will dictate whether the drug trafficker or money laundering side should be at fault for the loss.

25.     According to Individual 1, CHEN had multiple other money laundering couriers who worked for him in Chicago. Individual 1 identified Individual 4 (by name, and in unmarked photograph obtained from Individual 4's driver's license photo) as another Chicago-based money laundering courier who frequently conducted money pickups for CHEN.

26.     On or about July 27, 2018, agents interviewed Individual 2. Individual 2 told agents that s/he was the sole owner of Business A (which agents independently corroborated through business records).  According to Individual 2, on multiple prior occasions, Individual 1 had delivered bulk quantities of cash to Individual 2, for Individual 2 to wire to bank accounts in China. According to Individual 2, Individual 1 usually provided Individual 2 with the bank account information over WeChat. According to Individual 2, s/he used WeChat screenname "Money Gram."  According to Individual 2, Individual 1 gave Individual 2 the approximately $120,000 that agents seized from Business A on or about February 23, 2017.   According to Individual 2, after the seizure, Individual 1 asked Individual 2 for a law enforcement receipt for the seizure, but Individual 2 did not have one.

B.     Individual 4 Information

27.     On or about October 2, 2018, agents conducted surveillance in the area of West Pershing Street and South Western Avenue in Chicago, where Individual 4 was believed to reside.   At approximately 7:45 p.m., agents observed Individual 4 exit a residence on Pershing Street carrying a large plastic bag and enter a BMW X-5 (which was registered to Individual 4). Agents conducted an investigatory traffic

stop of the BMW. During the stop, Individual 4 provided photographic identification and gave voluntary consent for agent to search the BMW and the residence on Pershing Street, at which Individual 4 claimed to reside part time. Inside the BMW, agents recovered the plastic bag and found approximately $140,000 in cash inside. Inside of the residence on Pershing Street, agents recovered an apparent ledger, and two money-counting machines.

28.     After the searches, Individual 4 agreed to a voluntary interview.[6] In summary and pertinent part, Individual 4 told agents the following: for the previous approximately six months, Individual 4 had been receiving bulk amounts of money from Hispanic individuals in the Chicago area and delivering the money to Asian males.    According to Individual 4, the money s/he received from the Hispanic individuals was proceeds from drug sales, and the individuals to whom s/he delivered the money were responsible for laundering it.    According to Individual 4, s/he conducted the money pickups at the direction of MINGHAN CHEN, who lived in China and Mexico but frequently visited the United States, including Chicago.

---

[6]     Agents told Individual 4 that s/he was not under arrest at the time of the interview and did not have to speak with agents.  Individual 4 stated s/he wanted to cooperate. Agents made no promises to Individual 4. I believe the information that Individual 4 provided during the October 2, 2018, interview was reliable, as it was against his/her penal interest, and is corroborated in significant respects by independent evidence, including physical surveillance, witness interviews, searches, and money seizures. Individual 4 continued to cooperate with agents for approximately 3 months after the October 2, 2018 interview. His/her cooperation included conducting several controlled money pickups at law enforcement's direction. In or around January 2019, however, agents seized approximately $176,900 from Individual 4 as s/he was leaving his residence, which money Individual 4 was not authorized to pick up/handle as part of his/her cooperation. After the seizure, Individual 4 refused to speak to agents. Based on the above, agents discontinued Individual 4's cooperation based on evidence that s/he reoffended during the course of his/her cooperation.

29.     According to Individual 4, prior to each pickup, Individual 4 sent CHEN the serial number from a dollar bill in his/her possession and a cellphone number at which Individual 4 could be reached.  According to Individual 4, CHEN then passed that information to someone in Mexico and later Individual 4 received a phone call from a Hispanic male in possession of narcotics proceeds. Individual 4 then arranged to meet the caller and receive the proceeds. According to Individual 4, after receiving the money, Individual 4 notified CHEN, who then directed Individual 4 to deliver the money to another party (usually Asian males) to launder.

30.     Agents asked Individual 4 for consent to search his/her phone, and Individual 4 consented. Agents asked Individual 4 to identify his/her communications with CHEN.  Individual 4 pulled up a WeChat string of messages between Individual 4 and a WeChat user with screenname "NAI", who Individual 4 identified as MINGHAN CHEN. The communications contained several images of receipts reflecting wire transfers between Chinese bank accounts.  According to Individual 4, s/he sent the images to CHEN to confirm that the money that Individual 4 picked up for CHEN in Chicago had been laundered through Chinese bank accounts, and was available for CHEN to access in the accounts.  Based on my training and experience and involvement in this investigation, including debriefs of multiple other money laundering couriers, it is standard practice for a money laundering courier to send confirmation—usually in the form of an image of a wire transfer receipt—to his/her supervisor/boss (in this case, CHEN) that the narcotics proceeds involved in a pickup have been successfully transferred into bank accounts controlled by the

supervisor/boss, and are available for the supervisor/boss to access. An example of one of the apparent wire transfer receipts that Individual 4 sent to "Kai," who Individual 4 claimed to be CHEN, recovered on Individual 4's phone during the consensual search is below:



31.     Based on my training and experience, involvement in this investigation, and conversations with Chinese language translators assisting in this case, the above image depicts a receipt reflecting a wire transfer of 477,400 RMB (roughly $70,000) between two Chinese bank accounts. One of the bank accounts involved in the transfer is held in the name of Hua Quen Chen—agents do not know if this account is connected to CHEN, but, based on my training and experience, I know that it is common for Chinese money brokers based in Mexico to use bank accounts in the name of their family members in China to receive wire transfers.

32. According to Individual 4, s/he assisted CHEN with travel reservations for a recent rip CHEN took from Mexico City to Chicago. Inside Individual 4's apartment, agents also found credit cards displaying the name MINGHAN CHEN and a passenger receipt from American Airlines for January 27, 2018 from LA to Chicago for MINGHAN CHEN.

33. Toll and travel records further corroborated Individual 4's connection to CHEN. Specifically, based on CBP records, CHEN entered the United States on November 7, 2017, and exited the United States on November 27, 2017. Based on records subpoenaed from Hotel A in Chicago, CHEN stayed at Hotel A for several nights during this period. Based on Hotel A records, CHEN listed telephone number XXX-XXX-9966 as his personal number on hotel reservation records. Based on CBP records, CHEN also entered the United States on September 23, 2017, and exited the United States on October 10, 2017.

34. Agents subpoenaed toll records for telephone number XXX-XXX-9966. The toll records showed that, between September 29 and October 3, 2017, while CHEN was in the United States, the 9966 number had 14 contacts with a telephone number subscribed in the name of Individual 4 (XXX-XXX-1286).

**D.   CONCLUSION**

35. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that from no later than in or around February 2017 and continuing until at least October 2018, MINGHAN CHEN and others engaged in a conspiracy to commit an offense in violation of Title 18, United States Code, Section 1956, namely:

(1) to knowingly conduct a financial transaction affecting interstate and foreign commerce, which transaction involved the proceeds of a specified unlawful activity, namely, the felonious buying and selling and otherwise dealing in a controlled substance, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction knew that the property involved the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and (2) to transport, transmit, and transfer a monetary instrument and funds involving the proceeds of specified unlawful activity, namely, the felonious buying and selling and otherwise dealing in a controlled substance, from a place in the United States to and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal the nature, location, source, ownership, and control of the proceeds, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); all in violation of Title 18, United States Code, Section 1956(h).

FURTHER AFFIANT SAYETH NOT.

STEFANIE MOTON
Special Agent, Homeland Security Investigations

20

SUBSCRIBED AND SWORN to before me on February 22, 2019.

SHEILA FINNEGAN
United States Magistrate Judge